UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| LOUIS J. PETERSON, D.C., on behalf of Patients E, I, K, L, N, P, Q, and R, and on behalf of all others similarly situated, | Case No. 14-CV-2101 (PJS/BRT) |
| Plaintiff, | |
| v. | ORDER |
| UNITEDHEALTH GROUP INC.; UNITED HEALTHCARE SERVICES, INC.; UNITED HEALTHCARE INSURANCE COMPANY; and UNITED HEALTHCARE SERVICE LLC, | |
| Defendants. | |

---

| | |
|---|---|
| RIVERVIEW HEALTH INSTITUTE, on its own behalf and on behalf of all others similarly situated, | Case No. 15-CV-3064 (PJS/BRT) |
| Plaintiff, | |
| v. | |
| UNITEDHEALTH GROUP INC.; UNITED HEALTHCARE SERVICES, INC.; UNITED HEALTHCARE INSURANCE COMPANY; and OPTUM, INC., | |
| Defendants. | |

---

Jason S. Cowart, D. Brian Hufford, and William K. Meyer, ZUCKERMAN
SPAEDER LLP; Karen Hanson Riebel and Kristen G. Marttila,
LOCKRIDGE GRINDAL NAUEN P.L.L.P.; Anthony F. Maul, THE MAUL
FIRM, P.C.; Vincent N. Buttaci, John W. Leardi, and Paul D. Werner,
BUTTACI & LEARDI, LLC, for plaintiffs.

Gregory F. Jacob, Brian D. Boyle, Michael J. Walsh, Jr., and Meaghan
VerGow, O'MELVENY & MYERS LLP; Timothy E. Branson and Erin P.
Davenport, DORSEY & WHITNEY LLP, for defendants.

Two health-care providers—Dr. Louis Peterson and Riverview Health Institute

("Riverview")—bring these actions on behalf of certain of their patients against

UnitedHealth Group Inc. and various of its affiliates (collectively "United").  United

acts as the administrator for numerous health plans governed by the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001 et seq.  According to

plaintiffs, United has wrongfully failed to pay them and other providers who have

treated patients enrolled in United-administered plans.  Instead of paying the providers

what they are owed, plaintiffs allege, United withholds some or all of their payments in

order to offset overpayments that United claims to have made to the providers in

connection with their treatment of different patients enrolled in different plans.

Plaintiffs allege that this practice—known as "cross-plan offsetting"—violates ERISA

and the terms of the plans.

This matter is before the Court on the parties' cross-motions for summary

judgment on the issue of whether the relevant plans authorize cross-plan offsetting.  For

the reasons explained below, the Court holds that they do not.  But because this order

"involves a controlling question of law as to which there is substantial ground for

difference of opinion" and because "an immediate appeal from the order may

materially advance the ultimate termination of the litigation," the Court certifies this

order for immediate appeal pursuant to 28 U.S.C. § 1292(b).

## I. BACKGROUND

### A. Cross-Plan Offsetting

United is one of the largest health insurers in the world. It both administers and

insures health-insurance plans. Some of the plans that United administers are fully

insured, meaning that United uses its own funds to pay claims. Other plans that United

administers are self-insured, meaning that United uses the funds of the plan sponsor to

pay claims. Bishop-Heroux Dep. 26-27. United's fully insured business accounts for

22 percent of all claim payments; the remainder come from self-insured plans. Bishop-

Heroux Dep. 55-56.

Administering health-insurance plans is a complex business, and United

inevitably makes mistakes. One type of mistake is to pay a provider more than the

provider is owed under the patient's health-insurance plan. This litigation challenges a

particular technique that United uses to recover such overpayments—a technique

known as "cross-plan offsetting." The technique takes a little explaining:

Suppose that a patient named Andy is insured under a health plan administered

by United. Andy sees Dr. Peterson for treatment of a sore neck. Dr. Peterson submits

his bill to United. United pays $350 to Dr. Peterson. Later, however, United discovers

that it should have paid only $200 to Dr. Peterson.  United contacts Dr. Peterson, brings the overpayment to his attention, and asks him to return $150.

If Dr. Peterson agrees that he was overpaid and returns the $150, the problem is solved.  But if Dr. Peterson does not agree that he was overpaid and refuses to return the money, United has limited options for getting back its $150.  In theory, United could initiate administrative or legal proceedings against Dr. Peterson.  As a practical matter, however, United is unlikely to do so, as United would spend far more than $150 in pursuing the $150 overpayment.

Another option might be to engage in *same*-plan offsetting.  Under this approach, United would wait until Andy or anyone else covered by Andy's health plan is treated by Dr. Peterson.  When Dr. Peterson submits a bill to United on behalf of that patient, United would deduct $150 from the payment that it would otherwise make to Dr. Peterson.  From United's perspective, however, same-plan offsetting presents a big problem: Dr. Peterson may never again treat Andy or someone who is insured under Andy's plan.  Dr. Peterson practices in New York City, a giant metropolitan area.  Andy may work for a small company in a distant suburb, and he may be insured under a company-sponsored plan that covers only Andy and 20 other employees.  The chances may be slim that Dr. Peterson will ever again treat someone who is insured under

Andy's plan.  And thus, United may never have the opportunity to use same-plan

offsetting to recoup its $150 overpayment from Dr. Peterson.

To get around this problem, United adopted the practice of *cross*-plan offsetting.

Under this approach, United merely has to wait until *anyone* covered by *any* of the

thousands of plans that it administers sees Dr. Peterson.  Suppose, for example, that two

weeks after treating Andy, Dr. Peterson treats Betsy, who is injured while on vacation in

New York City.  Suppose further that Betsy is insured under a plan that is administered

by United and that covers Betsy and 50 of her co-employees (all of whom live in

San Diego).  When Dr. Peterson submits a bill to United on behalf of Betsy, United

would deduct $150 from the payment that Betsy's plan would otherwise make to

Dr. Peterson and thereby recoup the overpayment that Andy's plan made to

Dr. Peterson in connection with his treatment of Andy.  It is this practice of cross-plan

offsetting that Dr. Peterson and Riverview challenge in these lawsuits.

In their briefs, the parties refer to the allegedly overpaid claims (such as

Dr. Peterson's claim for treating Andy) as the "A claims," and the plans that made these

overpayments (such as the plan that covered Andy) as the "A Plans" or "Plan As."  The

parties refer to the later claims that United purportedly paid through debt cancellation

(such as Dr. Peterson's claim for treating Betsy) as the "B claims," and the

corresponding plans (such as the plan that covered Betsy) as the "B Plans" or

"Plan Bs."[1]

Dr. Peterson and Riverview are both out-of-network providers who provided

services to an "Andy"—that is, to a patient who was insured under a Plan A

administered by United.  Both providers submitted claims to United.  Both received

payment for those claims from the Plan A.  Both were later informed by United that

they had been paid too much.  Both disputed that they had been paid too much, and

both refused to return the alleged overpayment.  With respect to both, United

responded by recouping the disputed overpayment through cross-plan offsetting.  In

other words, when United learned that Dr. Peterson or Riverview had submitted a

subsequent claim regarding a "Betsy"—that is, a different patient who was insured

under a different United-administered plan (a Plan B)—United did not pay for those

claims by transferring money to Dr. Peterson or Riverview.  Instead, United purported

---

[1]There appears to be some confusion concerning the total number of plans at issue.  Plaintiffs assert that there are 60 Plan As and 59 Plan Bs.  *See* ECF No. 142 at 2. Defendants initially asserted that there are 46 Plan Bs, but later indicated that there are 51 Plan Bs.  *Compare* ECF No. 124 at 2 *with* ECF No. 150 at 1.  So far as the Court can tell from studying the charts set forth in the parties' third stipulation regarding Phase I proceedings [ECF No. 120]—and assuming that minor discrepancies in punctuation and the like do not indicate separate plans—there are 46 Plan Bs.  ECF No. 120 Ex. A. (Except where indicated, all ECF citations are to documents in the *Peterson* case. Pincites refer to the internal pagination of such documents.)

to pay for those claims by cancelling debt that Dr. Peterson or Riverview allegedly owed to the Plan A.

Cross-plan offsetting advantages United and disadvantages providers. When United and a provider dispute whether a claim was overpaid, cross-plan offsetting allows United to act as judge, jury, and executioner. United treats the provider as being in debt to Plan A—no matter how strongly the provider denies being in debt to Plan A—and United collects that disputed debt by offsetting money that Plan B owes to the provider. In theory, the provider could initiate administrative or legal proceedings against United to recover the offset. As a practical matter, however, the provider is unlikely to do so, as the provider would spend far more than, say, $150 in pursuing a $150 offset. In short, without offsetting, the onus would be on United to initiate proceedings and prove that the provider was overpaid by Plan A. With offsetting, the onus shifts to the provider to initiate proceedings and prove that it was underpaid by Plan B.

As much as providers such as Dr. Peterson and Riverview may dislike offsetting, they do not have standing to bring these actions in their own right. That is because health-insurance plans are contracts between United, on the one hand, and patients or in-network providers, on the other hand. Dr. Peterson and Riverview are out-of-network providers. Moreover, United has fiduciary obligations under ERISA to the

patients, not to providers.  For that reason, Dr. Peterson and Riverview have brought

these actions as assignees or authorized representatives of their patients,[2] and these

actions focus on whether, by engaging in cross-plan offsetting, United has violated any

legal duties to its *insureds*.

Speaking very broadly, plaintiffs make at least two contentions in these lawsuits.

First, they argue that nothing in any of the relevant plans authorizes United to engage

in cross-plan offsetting.  That contention is the subject of the parties' cross-motions for

summary judgment and will be addressed at length in this order.  Second, plaintiffs

argue that, in engaging in cross-plan offsetting, United is violating ERISA by furthering

its own interests at the expense of its insureds.  In particular, when a "Betsy" (that is,

someone insured under a Plan B) is treated by her doctor, she is legally responsible for

paying her doctor's bill.  When United pays her doctor not with cash, but instead by

cancelling a purported debt *that the doctor denies owing*, Betsy's doctor may very well

assert that he has *not* been paid for treating Betsy and demand that Betsy pay the full

amount of his bill.  Betsy would not be placed at such financial risk if United—which, as

---

[2]Riverview brings its action as the assignee of its patients' benefit claims. Dr. Peterson brings his action as the authorized representative of eight of his patients. At an earlier hearing, the Court expressed concern about the extent of Dr. Peterson's disclosures to his patients concerning the potential conflict in this litigation between his interests and his patients' interests.  Having reviewed the full extent of Dr. Peterson's disclosures, *see* Meyer Decl. Exs. N, O; ECF No. 109 at 3-4, the Court's concerns are satisfied.  Accordingly, the Court rejects United's argument that Dr. Peterson lacks authority to bring this action on behalf of his patients.

administrator of Plan B, owes a fiduciary duty to Betsy—would use Plan B assets to pay

Betsy's doctor.  Instead, United uses Plan B assets to help Plan A recover a disputed

debt.

## B. *Development and Implementation of the Cross-Plan Offset System*

United implemented its system of cross-plan offsetting in March 2007 as part of a

wider overhaul of its payment system.[3]  Jacob Decl., Mar. 28, 2016 [hereinafter "First

Jacob Decl."] Ex. D.  United did not implement cross-plan offsetting in response to a

request from a plan sponsor or insured; instead, United came up with this system on its

own.  Burch Dep. 65-70, 177.

One benefit to United of implementing cross-plan offsetting has already been

explained:  When United and a provider dispute whether the provider has been

overpaid, United is able to act unilaterally to recoup the alleged overpayment and

thereby place the burden on the provider to initiate proceedings and prove that it was

not overpaid (something most providers will not bother to do with respect to most

disputed overpayments).  Another benefit to United is not as obvious:  Many of the

Plan As—that is, the plans that make the overpayments—are fully insured; in other

words, the money that United mistakenly pays to a provider comes out of *United's*

---

[3]Plaintiffs contend that United engaged in cross-plan offsetting as early as 2004, long before it notified its clients of the practice in February 2007.  But the evidence that plaintiffs cite, *see* ECF No. 142 at 8, does not support their contention.

pockets.  Many of the Plan Bs—that is, the plans that send money to the Plan As to

reimburse them for the overpayments—are self insured; in other words, the money that

reimburses United for its alleged overpayment comes out of the *plan sponsors'* pockets.

Several internal United documents emphasize this point and gush about how cross-plan

offsetting will allow United to take money for itself out of the pockets of the sponsors of

self-insured plans.  *See* Meyer Decl. Ex. A at 13735 (September 2004 presentation stating,

in bold text, that the new system "[a]llows recovery of fully insured overpayments on

self funded claim payments!"); *id*. Ex. H at 13910 (August 2004 presentation stating that

"[c]rossing policies for bulk recovery helps recover FI [fully insured] dollars faster"); *id.*

Ex. I at 13757 (callout on a 2005 chart of figures highlighting a "[f]ully insured o/p

recovery on a [self insured] payment!").

Before implementing cross-plan offsetting, United sent a letter to existing clients[4]

describing the new system and how it would work.  First Jacob Decl. Ex. D.  The letter

described the new system as follows:

> Under our existing process, a claim overpayment for a self
> insured plan could only be recovered when both the
> overpayment and the claim payment involved the same self

---

[4]The parties dispute how many of the plans that are at issue in this case were
existing clients and therefore received the 2007 letter disclosing the change.  United
contends that a "majority" of the plans received the letter, but the evidence that United
cites indicates that only 21 of the plans received the letter.  *See* Vang Decl. ¶¶ 3-4.
Whether the number of Plan Bs is 59, 51, or 46, *see supra* note 1, 21 is still less than half of
the plans at issue.

> insured plan. Thus, a self insured plan that had a claim
> overpayment with a particular provider would have to wait
> until its participants incurred additional claims with that
> provider before the overpayment could be deducted. Under
> the new process, we will, in most instances, be able to
> recover claim overpayments made to a provider by reducing
> future claim payments to that provider, regardless of
> whether those future claim payments involve your plan,
> another self insured plan or a fully insured plan.

First Jacob Decl. Ex. D at 2605. In other words, United emphasized the potential

benefits of cross-plan offsetting to the self-insured plans, but called no attention to the

potential benefits of cross-plan offsetting to United itself.

United's system for cross-plan offsetting includes rules for prioritizing

recoveries. This is necessary because United might allege that multiple overpayments

were made to a single provider. So, for example, United may allege that self-insured

Plan A1 overpaid Dr. Peterson by $100 on May 1, and that fully insured Plan A2

overpaid Dr. Peterson by $125 on June 1, and that self-insured Plan A3 overpaid

Dr. Peterson by $75 on July 1. When Dr. Peterson submits a claim to self-insured

Plan B1 on August 1, and United decides that Plan B1 owes Dr. Peterson $200 in

connection with that claim, and United further decides to use that $200 to recoup some

of the overpayments previously made to Dr. Peterson, to which plan should United

transfer Plan B1's money? Plan A1? Plan A2? Plan A3?

Under United's system for cross-plan offsetting, fully insured plans are first in line to recover their overpayments from fully insured claim payments.  Only after fully insured overpayments have been satisfied may self-insured plans recover from fully insured claim payments.  Likewise, self-insured plans are first in line to recover from self-insured claim payments, after which fully insured plans may recover.  *Id.* at 2606.  The 2007 client letter explained this system and provided several illustrative examples.  *Id.* at 2606-08.

In this litigation, every Plan A—that is, every plan that made overpayments— was fully insured.  Meyer Decl. Exs. C, D.  Conversely, the majority of the Plan Bs—that is, the majority of plans from which the overpayments were recovered—were self- insured.  Meyer Decl. Ex. F; ECF No. 74 ¶ 5.  In other words, every one of the cross-plan offsets at issue in this litigation put money in United's pocket, and most of that money came out of the pockets of the sponsors of self-insured plans.[5]

---

[5]United contends that the recoveries in this case are not representative of the system as a whole.  To support this argument, United offers a one-page summary of figures purporting to represent the amount of fully insured and self-insured payments and offsets in 2015.  This one-page document apparently represents the jottings of United's counsel.  *See* Jacob Decl., Apr. 22, 2016 [hereinafter "Second Jacob Decl."] Ex. T.  United does not cite any affidavit or testimony that would establish foundation for this document, nor was the Court able to locate any in the record.  (There was some discussion of the document at one deposition, but that discussion is not sufficient to establish foundation.  *See* Bishop-Heroux Dep. 274-77.)  Plainly, then, the document is not admissible.

(continued...)

When United implemented this system in 2007, it gave existing clients about two weeks to decide whether to opt out.  First Jacob Decl. Ex. D at 2605 (exemplar letter giving clients until February 22, 2007 to opt out); *id.* Ex. A at 3859 (clients were given advance notice of letters by February 7 and letters were mailed on February 9).  New clients do not have that option; they must participate in cross-plan offsetting or find a different claims administrator.  Burch Dep. 282-83.

The parties dispute how much information about cross-plan offsetting United provides to its new clients and whether any of that information is in writing.  As with several other issues, the record on this issue is somewhat murky.  It appears, however, that disclosures concerning United's system of cross-plan offsetting are mostly or entirely handled by United's banking team during what appear to be fairly technical explanations of the banking, account-setup, and account-funding processes.  Bishop-Heroux Dep. 192-94, 226-27; Bishop-Heroux Decl. ¶¶ 6-7; Second Jacob Decl. Ex. X.  It also appears that such disclosures mostly occur orally and on a somewhat ad hoc basis, Burch Dep. 282, although United has identified one written document that explicitly mentions cross-plan offsetting—a document that United has apparently given to new

---

[5](...continued)
That said, it is worth noting that, taking the document at face value, the document shows that while United made 22 percent of the claim payments, it received 36 percent of the overpayment recoveries.  Thus, whether one credits the plaintiffs' numbers or United's, cross-plan offsetting benefits United more than it benefits the sponsors of self-insured plans.

clients since 2010.  Bishop-Heroux Decl. ¶ 6; Second Jacob Decl. Ex. X.  The document

does not provide nearly as much detail about cross-plan offsetting as the 2007 letter,

however—and, like the 2007 letter, the document says nothing about the fact or extent

of United's conflict of interest.  Second Jacob Decl. Ex. X at 3816.  United says that it

provides these oral and written disclosures to its clients' "benefits and finance and

treasury folks," Bishop-Heroux Dep. 227, but it is not clear whether those individuals

have authority to make plan-wide fiduciary decisions, nor is it clear whether these

disclosures are made before or after a plan sponsor decides to become a United client.

### C.  *Plan B Language*

As noted, the issue presently before the Court is whether the Plan Bs that are at

issue in this litigation authorize United to engage in cross-plan offsetting.  United

argues that they do.  Dr. Peterson and Riverview argue that they do not.

There are 46 Plan Bs that are at issue in this litigation.  All of those Plan Bs grant

United the authority to interpret plan terms.  ECF No. 120 Ex. B at 2-7.  Almost all of

those Plan Bs—specifically, 40 of 46—also contain provisions that specifically address

overpayments and recoveries.  ECF No. 120 Ex. A.  The parties have grouped these

provisions into 16 different types; some plans have more than one type.  *Id.*  Having

studied the parties' charts, the Court has identified 17 different combinations of

overpayment and recovery provisions that appear in the various plans.[6]

Every one of the overpayment and recovery provisions is triggered only when

the plan itself makes an overpayment.  ECF No. 120 Ex. B at 8-25.  In other words, each

Plan B authorizes the recovery of overpayments made *by the Plan B*.  None of the

overpayment or recovery provisions contain any language allowing other plans to

recover their overpayments from the plan.[7]  In other words, not one Plan B authorizes

recovery of an overpayment made *by a Plan A*.

Of the 40 plans containing overpayment and recovery provisions, all except four

explicitly mention offsetting.  ECF No. 120 Ex. B at 19, 21, 24-25 (N, P, S, and T

provisions do not mention offsets).  In every offset provision save one (provision G,

---

[6]The parties have assigned a letter to each of the 16 types of overpayment and
recovery provisions.  The 17 combinations—and the number of plans that contain each
combination—are as follows:

| E, M, O | F, N | E, M | G, N | H | E, N | E, O | K, O | I |
|---------|------|------|------|---|------|------|------|---|
| 14 | 8 | 2 | 2 | 2 | 1 | 1 | 1 | 1 |
| J | L, M, O | N | P | Q | R | S | T | |
| 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |

[7]A number of the plans have coordination-of-benefits clauses providing that
United may reimburse another plan under which the participant is covered if the other
plan pays a benefit that United should have paid.  ECF No. 120 Ex. B at 20.  These
clauses do not authorize the cross-plan offsetting at issue in this case, however.

which appears in only two plans), the authority of the administrator to offset is

described in terms that make it clear that offsets are taken from other benefits payable

under that plan or from other benefits or compensation paid by the plan's sponsor.

Provision G contains similar language, stating:

> If the Covered Person, or any other person or organization
> that was paid, does not promptly refund the full amount, we
> may reduce the amount of any future Benefits *for the Covered
> Person that are payable under the Policy*.

ECF No. 120 Ex. B at 11 (emphasis added).  But provision G also includes somewhat

broader language stating that, if a provider fails to respond to a notice of overpayment,

the overpayment may be recovered "from other payments we owe the provider . . . ."

*Id.*

In sum, 36 of the 46 Plan Bs that are at issue in this litigation specifically address

offsetting; all of those plans explicitly authorize same-plan offsetting; and not one of

those plans explicitly authorizes cross-plan offsetting.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

### B. Authorization for Cross-Plan Offsetting

As noted, all of the Plan Bs grant United discretionary authority to interpret plan terms.  United's interpretation is therefore reviewed for abuse of discretion.  *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 2005) (en banc).

United interprets the Plan Bs to authorize cross-plan offsetting.  Ultimately, the question for this Court is whether that interpretation is reasonable.  *Id.* at 999.  In making this determination, the Court must consider the factors identified in *Finley v. Special Agents Mutual Benefit Association*, 957 F.2d 617 (8th Cir. 1992), which include: (1) whether the interpretation is consistent with the goals of the plan; (2) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (3) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (4) whether the administrator has interpreted the relevant plan language consistently; and (5) whether the interpretation is contrary to the clear language of the plan.  *Id.* at 621.

It should be noted that, in looking carefully at the language of the plans and considering the *Finley* factors, the Court is doing something that United itself did not do before implementing cross-plan offsetting.  There is no evidence in the record that, prior to implementing cross-plan offsetting, United examined the language of any plan or even considered whether the practice was authorized.  *Cf. King*, 414 F.3d at 1001-04 (discussing the administrator's consideration of plan language during the claims-administration process).  Instead, United simply plunged ahead.  Only after getting sued did United hunt through the plans for any language that might provide a post hoc justification for its conduct.  United's hunt was not terribly successful.  United admits that it was not able to find a single provision of a single plan that explicitly authorizes cross-plan offsetting.  ECF No. 124 at 25 ("To be sure, none of the United Plans explicitly address cross-plan offsetting").  United is therefore left arguing that it has *implicit* authority to engage in cross-plan offsetting under common, generic provisions that require the administrator to pay benefits and that grant the administrator discretion to interpret and administer the plans.[8]

---

[8]United attempts to reframe the issue before the Court by contending that plaintiffs' claims for past-due benefits turn solely on the meaning of the word "pay," and that United has reasonably interpreted "pay" to mean payment through debt cancellation.  This argument mischaracterizes the issue.  The question is not whether United can, in the abstract, pay a provider who treats a patient insured under a plan by cancelling the provider's debt to that plan.  The question is whether United, in its capacity as administrator of a Plan B, can pay a provider who treats a patient insured

(continued...)

United argues—and the Court does not doubt—that a plan need not spell out every possible action that a claims administrator may take on its behalf.  United admits, however, that the discretion of a claims administrator is not unlimited.  In determining what authority a plan gives to an administrator, the plan must be read in light of trust law and the fiduciary duties imposed by ERISA.  *Admin. Comm. of Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Gamboa*, 479 F.3d 538, 542 (8th Cir. 2007); *Finley*, 957 F.2d at 621.  These fiduciary duties are among "'the highest known to the law.'"  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).  ERISA requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits and defraying reasonable administrative expenses.  29 U.S.C. § 1104(a)(1).  ERISA also prohibits a plan fiduciary from dealing with the assets of the plan in the fiduciary's own interest and from acting in any capacity on behalf of a

---

[8](...continued)
under Plan B by cancelling debt that the provider allegedly owes to a Plan A—that is, to a different, completely unrelated plan that also happens to be administered by United.

As an aside, the Court notes that United's contention that it "pays" providers by cancelling debt seems to have a major flaw.  It may be reasonable for United to deem the cancellation of an *uncontested* debt of $100 as providing a $100 "payment" to the debtor.  But the debts that matter for purposes of this litigation are *contested*.  Unless the provider's grounds for disputing the debt are frivolous, it is not reasonable for United to deem the cancellation of a *contested* debt of $100 as providing a $100 "payment."

party whose interests are adverse to those of the plan or plan participants.  29 U.S.C.

§ 1106(b)(1), (b)(2).

Thus, for example, the Third Circuit held that the trustees for two jointly

administered plans violated ERISA by causing one plan to make a loan to the other.

*Cutaiar v. Marshall*, 590 F.2d 523, 529 (3d Cir. 1979) ("When identical trustees of two

employee benefit plans whose participants and beneficiaries are not identical effect a

loan between the plans without a § 408 exemption, a per se violation of ERISA exists.").

The Third Circuit so held even though there was a "large overlap" in the plans'

participants and even though the terms of the loan were fair and reasonable with

respect to both plans.  *Id.* at 525, 528.  As the Third Circuit explained, "each plan

deserves more than a balancing of interests"; instead, "[e]ach plan must be represented

by trustees who are free to exert the maximum economic power manifested by their

fund whenever they are negotiating a commercial transaction."  *Id.* at 530.

Similarly, the Fourth Circuit found that an insurer who obtained a release from a

participant in relation to one plan could not, consistently with its fiduciary duties, rely

on that release to deny benefits to that participant under a different plan.  *Barron v.*

*UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 316 (4th Cir. 2001).  Because the insurer

obtained the release in its capacity as a fiduciary for the first plan, the release was solely

for the benefit of that plan, and it would violate ERISA for the release to inure to the

insurer's own benefit in connection with its administration of the second plan.  *Id.*  As

the Fourth Circuit explained, the insurer's "duty as administrator of the Comcast Plan

must not be confused with its duties as administrator of other plans and must not be

compromised by its interest in administering other plans."  *Id.*

     In light of this case law and the strict fiduciary duties imposed by ERISA, cross-

plan offsetting is, to put it mildly, a troubling use of plan assets—one that is plainly in

tension with "the substantive or procedural requirements of the ERISA statute . . . ."

*Finley*, 957 F.2d at 621.  In stark terms, cross-plan offsetting involves using assets from

one plan to satisfy debt allegedly owed to a separate plan—a practice that raises

obvious concerns under §§ 1104 and 1106.  These concerns are particularly acute in this

case, in which every offset that United orchestrated did not just benefit a different,

unrelated plan, but benefited United itself.

     Cross-plan offsetting creates a substantial and ongoing conflict of interest for

claims administrators who, like United, simultaneously administer both self-insured

and fully insured plans.  Recall that nearly a quarter of all claim payments come out of

United's own pocket.  As the single biggest payor of claims, United's personal stake in

cross-plan offsetting dwarfs that of any self-insured plan.  An administrator in this

circumstance has every incentive to be aggressive about looking for overpayments from

its own fully insured plans (which overpayments can be recovered from self-insured

plans) and less aggressive about looking for overpayments from self-insured plans (which overpayments might be recovered from fully insured plans).  And indeed, this incentive is reflected in United's internal documents, which enthusiastically describe how cross-plan offsetting will permit United to reach into the pockets of the sponsors of self-insured plans to recover the overpayments that United makes in connection with fully insured plans.

Cross-plan offsetting may nevertheless be permitted under ERISA.  It is undoubtedly true, as United argues, that cross-plan offsetting can benefit plan participants through administrative savings and increased recoveries.  It is also undoubtedly true, as United is reluctant to acknowledge, that cross-plan offsetting can harm plan participants.  As described above, a provider such as Dr. Peterson who disputes that he has been overpaid by Plan A and who treats a patient insured by Plan B (a "Betsy") may decide not to accept payment from Plan B in the form of the cancellation of a debt that he does not believe he owes to Plan A.  The provider may instead choose to balance bill Betsy, as she bears ultimate legal responsibility for paying the bill.  Thus, Betsy—who, under the terms of her Plan B, is entitled to have her provider paid—can find herself drawn into a dispute about whether her provider was

in fact overpaid when, weeks or months earlier, he submitted a claim for treating a

different patient under a different plan.[9]

It is fairly debatable whether cross-plan offsetting is ever permissible under

ERISA.  (That issue is not presently before the Court.)  It is not fairly debatable,

however, that the type of cross-plan offsetting challenged in this case—that is, cross-

plan offsetting engaged in by an administrator who insures some (but not all) of the

plans—presents a grave conflict of interest.  In such a situation, ERISA would seem to

require that the administrator (at a minimum) identify the potential costs and benefits

of cross-plan offsetting to each plan and, after carefully weighing those costs and

benefits, decide whether engaging in cross-plan offsetting is in the best interests of that

plan.

Cross-plan offsetting may be in the best interests of the participants of some

plans (say, large national plans that make a lot of overpayments because participants

are treated by numerous providers who are careless when submitting claims), but not in

the best interests of the participants of other plans (say, small local plans that make few

overpayments because participants are treated by a only a few providers who are

---

[9]Of course, this risk is also present with same-plan offsetting.  But when a plan engages in same-plan offsetting, *all* of the advantages of offsetting inure to the plan doing the offsetting.  The same cannot be said for cross-plan offsetting, under which some plans might disproportionately enjoy the benefits and other plans might disproportionately bear the costs.

careful when submitting claims).  At a minimum, a fiduciary of a plan is obligated

under ERISA to make a careful and fully informed decision about whether engaging in

cross-plan offsetting is in the best interests of the participants in *that plan*.  This is not the

same as deciding whether engaging in cross-plan offsetting is in the best interests of the

administrator itself—or in the best interests of other plans.  *See* 29 U.S.C. § 1104(a) ("a

fiduciary shall discharge his duties with respect to a plan solely in the interest of the

participants and beneficiaries").

United's interpretation of the language of the Plan Bs—that is, United's position

that it has authority to engage in cross-plan offsetting under generic provisions that

require United to pay benefits and that grant United discretion to interpret and

administer the plans—is problematic not merely because it is in tension with ERISA.

United's interpretation also renders the Plan Bs' overpayment and recovery provisions

meaningless.  As discussed above, 40 of the 46 Plan Bs have overpayment and recovery

provisions, and 36 of those specifically address offsets.  All of the overpayment and

recovery provisions—both those that explicitly authorize offsets and those that do

not—are triggered only when the *Plan B itself* has made an overpayment.  In addition,

only two of the 46 plans (the two that contain provision G) even arguably have

language broad enough to permit the plans to recover their overpayments from other

plans.

Even if all of the ambiguities in all of the Plan Bs could be stretched to permit the Plan Bs to recover their overpayments from other plans, that would not help United. The issue in this case is not whether the Plan Bs can recover their overpayments from other plans; the issue is whether the other plans can recover their overpayments from the Plan Bs.  As noted, not a single one of the Plan Bs contains language authorizing such recoveries.

United contends that permission for such recoveries is implicit in the language allowing the Plan Bs to recover from other plans.  The argument, in essence, is that if a Plan B explicitly authorizes the recovery of its overpayments from other plans, that Plan B must implicitly authorize the other plans to recover their overpayments from the Plan B—because common sense suggests that no plan is going to allow the Plan B to recover its overpayments unless the Plan B reciprocates.  This might be a good argument if there were in fact language in a Plan B that made it clear that the Plan B could recover its overpayments from other plans (although it would still be an odd and backhanded way to authorize cross-plan offsetting).  But none of the 46 Plan Bs that are at issue in this case have such language.  Rather, United relies on generic provisions about paying claims, which United says give it *implicit* authority to recover the Plan Bs' overpayments from other plans—and then United doubles down by finding implicit

authority within this implicit authority to allow the other plans to recover their

overpayments from the Plan B.

United goes too far.  Without explicit language authorizing United to recover a

Plan B's overpayments from other plans, United acted unreasonably in interpreting

each Plan B to authorize not only that practice, but also the practice of allowing other

plans to use the Plan B's assets to recoup their own overpayments.  Again, the vast

majority of the plans at issue contain provisions that specifically address offsetting.  It

would have been easy for the authors of these plans to authorize cross-plan

offsetting—and any prudent fiduciary asked to engage in cross-plan offsetting would

insist on such authority, given the tension between engaging in that practice and

fulfilling the fiduciary duties imposed by ERISA.  The fact that the vast majority of the

policies explicitly address the subject of offsetting and do not authorize cross-plan

offsetting is powerful evidence that United acted unreasonably in interpreting the plans

to permit cross-plan offsetting.

United contends that, under *Pilger v. Sweeney*, 725 F.3d 922 (8th Cir. 2013), a plan

that explicitly authorizes *same*-plan offsetting cannot be construed to limit the

administrator's ability to engage in *cross*-plan offsetting.  In *Pilger*, the Eighth Circuit

held that an ERISA plan could recoup overpayments that it made to retirees by

reducing the retirees' future benefits.  In one short cryptic paragraph that both

described and rejected the retirees' argument to the contrary, the court noted without

elaboration that the plan contained "broad language granting Defendants discretion to

take remedial action . . . ."  *Id.* at 926.  United points out that the *Pilger* plaintiffs had

argued in their appellate brief that the plan's specific offset provision did not apply in

their case and that therefore the plan lacked the authority to take the offsets.  First Jacob

Decl. Ex. O at 18-19.  According to United, this means that *Pilger* stands for the

proposition that narrow offset language in a plan does not preclude the administrator

from finding broader offset authority in the plan's generic provisions.

United reads more into *Pilger* than it can reasonably bear.  The Eighth Circuit

nowhere even mentions the offset language on which United's argument depends.

More importantly, the offsets at issue in *Pilger* involved not only the same plan, but the

same beneficiaries.  There is nothing particularly unusual or surprising about a plan

having the authority to recoup overpaid benefits from the very beneficiary who

received the overpayments, and such a practice (unlike cross-plan offseting) is fully in

keeping with the administrator's fiduciary duties to the plan and its participants.  The

fact that *Pilger* found authority to take such offsets in generic remedial language does

not mean that it is reasonable to read similar generic language to authorize the far more

problematic practice of cross-plan offsetting.  The Court therefore finds *Pilger* to be of

little help to United.

United also cites *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d

725 (5th Cir. 2010)—a case with facts similar to this one—in which the Fifth Circuit held

that the plans at issue authorized cross-plan offsetting. *Id.* at 729-30. *Quality Infusion*

does not so much as mention ERISA, however, and it relies almost entirely on the

*absence* of language *prohibiting* cross-plan offsetting. *Id.* at 729 (noting that the plan

"does not specify that the overpayment must be offset against the same patient's future

claim"); *id.* at 730 ("No language in any of the three plans require BCBS to confine its

contractual setoff rights to deductions from subsequent benefit payments to the same

patient or under the same plan."). Whatever the merits of the Fifth Circuit's approach,

it is not the approach of the Eighth Circuit. *Finley* requires courts to consider the

fiduciary duties imposed by ERISA, as well as other factors ignored by *Quality Infusion*.

*See* 957 F.2d at 621.

Applying the *Finley* factors, the Court finds that United's interpretation is

unreasonable. The plans themselves do not authorize cross-plan offsetting. To the

contrary, most of the plans contain specific overpayment and recovery language that

would be rendered meaningless if United was authorized by the generic clauses that it

relies upon to engage in cross-plan offsetting. United has not consistently interpreted

any plan language to permit cross-plan offsetting; instead, United first implemented

cross-plan offsetting and then, after it got sued, rooted through the language of the

plans in the hope of finding something that might arguably support the practice.  And

cross-plan offsetting raises serious concerns under ERISA, especially in this situation,

where United administers all of the plans but insures only some of the plans.  In light of

these factors and the other factors discussed above, the plans cannot reasonably be read

to permit cross-plan offsetting.

United raises one last argument in favor of finding that the plans permit cross-

plan offsetting:  According to United, it was the (unconflicted) *plan sponsors* who

directed United to engage in this practice, and United was just following orders.  United

bases this contention on the February 2007 letter that it sent to its existing clients and on

the disclosures that it has since made to (some of) its new clients.  As United would

have it, then, because it told some of its clients that it was implementing cross-plan

offsetting, and because it gave those clients a chance to opt out, the decision to engage

in cross-plan offsetting was really the decision of the plan sponsors, not United.

Moreover, although new clients are not allowed to opt out of cross-plan offsetting,

United contends that, because it discloses the system up front, new clients likewise are

responsible for the decision to engage in the practice.

United compares its 2007 letter and opt-out procedure to the "negative consent"

procedure approved by the Department of Labor ("DOL") in several advisory opinions.

*See* DOL Adv. Ops., 2003-09A, 2001-02A, 1997-16A.[10]  The Court very much doubts that

United's 2007 letter was sufficient to transfer the fiduciary decision to United's clients

under this authority.[11]  The DOL opinions were premised in part on the fact that the

companies fully and accurately disclosed all material information to their clients and

gave those clients a lengthy period of time—at least 60 days in one case, and up to 120

days in another—to make a decision.[12]  In addition, there is no suggestion in any of the

opinions that the companies attempted to influence their clients' choices; instead, each

company simply provided information and left the choice entirely to the client.

    In contrast to those cases, United did not fully and accurately disclose all

material information to its clients.  Some clients may not have received *any* information

about cross-plan offsetting, and those who did get information were not told that

United itself would be the largest single beneficiary of the cross-plan offsetting system

---

[10]DOL advisory opinions may be found online at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions.

[11]Notably, under ERISA Procedure 76-1 regarding DOL advisory opinions, "[o]nly the parties described in the request for opinion may rely on the opinion," and "only to the extent that the request fully and accurately contains all the material facts and representations necessary to issuance of the opinion and the situation conforms to the situation described in the request for opinion."  Employee Benefit Plans, Advisory Opinion Procedure, 41 Fed. Reg. 36281, 36283 § 10 (Aug. 27, 1976).

[12]In one of the cases, either party could have terminated the relationship with 30 days' written notice, but that appears to have been the result of a contractual provision to which both parties agreed.  DOL Adv. Op. 2003-09A.  In the same case, the trustee-service company provided 60 days' written notice of proposed fee adjustments.

that it was proposing.  In addition, United gave existing clients only a couple of weeks

to decide whether to opt out of the system.  Finally, United certainly did not remain

neutral and take care to ensure that each client's decision was truly its own; instead,

United "strongly encourage[d]" its clients to participate in cross-plan offsetting.  First

Jacob Decl. Ex. D at 2605; *id.* Ex. E (internal United bulletin instructing that clients can

be excluded from the new system if they "strongly resist[]").  In short, even if the DOL

opinions could be considered binding authority, the Court would find that United

failed to meet the criteria for shifting United's fiduciary responsibilities onto its existing

clients.

The situation with respect to new clients is murky.  As discussed above, it is not

clear to whom information about cross-plan offsetting is given when United signs up a

new client; in particular, it is not clear whether at any point the information is given to

someone with plan-wide authority to authorize cross-plan offsetting.  Nor is the timing

of the communication clear; for all the Court can tell, the only time that the information

is conveyed is during the banking setup process, which appears to be a fairly technical

process that may or may not take place before the plan sponsor has already contracted

with United.  In addition, the evidence of what, exactly, United tells its new clients is

vague.  Most of the communications are oral and respond to client questions.  The only

written communication—a communication that has been given to existing clients only

since 2010—mostly addresses technical details of setting up and funding accounts.  The

single reference to cross-plan offsetting in that communication is buried among these

details.  *See* Second Jacob Decl. Ex. X at 3816.  There is no indication in the record that

United provides a full and accurate discussion of cross-plan offsetting to new clients,

tells new clients that United is the single biggest beneficiary of cross-plan offsetting, or

identifies the nature or extent of United's conflict of interest.  The Court therefore rejects

United's argument that the decision to engage in cross-plan offsetting is made by plan

sponsors rather than by United.

United also points to a provision that appears in certain Administrative Service

Agreements ("ASAs") that United has with some of its clients.  According to United,

this provision directs United to take cross-plan offsets.  A representative example of the

provision reads as follows:

> In some instances, UnitedHealthcare may be able to obtain
> Overpayment recoveries by applying (or offsetting) the
> Overpayment against future payments to the provider made
> by UnitedHealthcare.  In effectuating Overpayment
> recoveries through offset, UnitedHealthcare will follow
> UnitedHealthcare's established Overpayment recovery rules
> which include, among other things, the prioritization of
> Overpayment credits based on the age of the Overpayment
> in UnitedHealthcare's system and funding type.

First Jacob Decl. Ex. J at 28516.

Contrary to United's contention, this provision does not direct United to engage in cross-plan offsetting.  Indeed, this provision does not *direct* United to do anything; it simply states that United "may" recover overpayments through offsetting.  Moreover, this provision does not actually describe the practice of *cross*-plan offsetting.  The closest it comes to doing so is by referring to prioritizing credits based on "funding type," which may be a vague allusion to the distinction between fully insured and self-insured plans.  In short, the language in the ASAs does not come close to establishing that it is the plan sponsors, rather than United, that exercise the fiduciary discretion to engage in cross-plan offsetting.

Even if United's 2007 letter to its existing clients, its subsequent disclosures to (some of) its new clients, and the language in (some of) the ASAs were sufficient to shift responsibility for the fiduciary decision from United to its clients, the Court would still find that the plans cannot reasonably be read to permit cross-plan offsetting.  True, if the plan sponsors actually made the decision to participate in cross-plan offsetting, that would alleviate the concern about United's initial conflict of interest.  As noted, however, United labors under a continuing conflict of interest in administering the cross-plan offset system because United fully insures some but not all of the plans.  More importantly, the fact remains that cross-plan offsetting is in tension with ERISA's fiduciary rules, is not provided for in the plans, and is at odds with the specific offset

language contained in most of the plans.  As a result, United did not act reasonably in

interpreting the Plan Bs that are at issue in this case to permit cross-plan offsetting.  The

Court therefore grants plaintiffs' motions for partial summary judgment and denies

United's motions for full summary judgment.

### C.  Certification for Immediate Appeal

Under 28 U.S.C. § 1292(b), a district judge may certify an otherwise unappealable

order for immediate appeal if the order "involves a controlling question of law as to

which there is substantial ground for difference of opinion" and "an immediate appeal

from the order may materially advance the ultimate termination of the litigation . . . ."

The Court finds that these criteria are met in this case.

The Court recognizes that interlocutory appeals are discouraged and should be

authorized only sparingly and in extraordinary cases.  *Union Cty., Iowa v. Piper Jaffray &*

*Co.*, 525 F.3d 643, 646 (8th Cir. 2008).  In fact, the undersigned has never certified an

order for interlocutory appeal during his almost 11 years on the bench.  This case,

however, represents the rare case in which interlocutory appellate review is warranted.

This order resolves a controlling and dispositive question of law: whether United

acted reasonably in interpreting the plans to permit cross-plan offsetting.  *See Kennedy v.*

*Georgia-Pacific Corp.*, 31 F.3d 606, 609 (8th Cir. 1994) (appellate courts review the district

court's application of the abuse-of-discretion standard in ERISA cases de novo).  There

is also a substantial ground for difference of opinion:  The practice of cross-plan

offsetting presents an issue of first impression in the Eighth Circuit and the sole extra-

circuit authority to address the practice found that it was permissible.

      In addition, conclusively resolving this threshold question would greatly

advance the termination of this litigation.  If, as United contends, the plans authorize

cross-plan offsetting, this litigation will be over as a practical matter, as it will be very

difficult for plaintiffs to hold United liable for doing what the plans authorized it to do.

But if, as plaintiffs contend and as the Court has found, the plans do not authorize

cross-plan offsetting, then the parties and the Court will face *years* of extraordinarily

complex and expensive discovery, non-dispositive motion practice, litigation over class

certification, dispositive-motion practice, trial, and litigation over remedies.  The parties

have already pointed to a host of complicated legal issues that the Court will have to

address in these actions—and these actions represent just two of many related actions

that are pending in this District.

      Finally, this is an exceptional case.  United is, by far, the largest health insurer in

the United States, and it is one of a handful of the largest health insurers in the world.

United has engaged in cross-plan offsetting for the past decade.  If United is ultimately

enjoined from engaging in the practice, United will have to undertake the extremely

expensive and disruptive process of unwinding its cross-plan offsetting practice.

Having lost its initial (and, it appears to the Court, strongest) argument in favor of cross-plan offsetting, United now faces a lengthy period of uncertainty concerning a major component of its business.  Immediate appellate review of this issue would not only significantly advance the litigation, but also reduce the time that United will spend in legal limbo.

For these reasons, the Court will certify this order for immediate appeal.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.  Defendants' motions for summary judgment [ECF No. 122 in 14-CV-2101, ECF No. 69 in 15-CV-3064] are DENIED.

2.  Plaintiffs' motions for summary judgment on Phase I issues [ECF No. 140 in 14-CV-2101, ECF No. 87 in 15-CV-3064] are GRANTED.

3.  Pursuant to 28 U.S.C. § 1292(b), the Court certifies this order for immediate appeal.  Any party wishing to take an appeal must, pursuant to § 1292(b), apply to the United States Court of Appeals for the Eighth Circuit within 10 days of the date of this order.  If the Eighth Circuit accepts the appeal, the Court will stay this case pending the outcome of the appeal.

Dated:  March 14, 2017          s/Patrick J. Schiltz
                                Patrick J. Schiltz
                                United States District Judge